**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| AIRBNB, INC., AIRBNB PAYMENTS, INC., and HOTEL TONIGHT, LLC<br><br>            Plaintiffs,<br><br>    v.<br><br>VISA INC., VISA U.S.A. INC., and VISA INTERNATIONAL SERVICE ASSOCIATION<br><br>            Defendants.<br><br>**This Document Relates to:**<br><br>*In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation*, Nos. 05-md-01720 (MKB) (VMS) and 1:14-md-01720-JG-JO (E.D.N.Y.). | CASE NO.: __-cv-__<br><br><br>**COMPLAINT**<br><br>**Jury Trial Demanded** |

## NATURE OF THE ACTION

1.      Having timely opted out of the Rule 23(b)(3) Settlement class in this multidistrict litigation, Airbnb, Inc., Airbnb Payments, Inc., and Hotel Tonight LLC now bring this individual opt-out action against Defendants Visa U.S.A. Inc., Visa International Service Association, and Visa Inc. (collectively, "Visa" or "Defendants").

2.      Airbnb, Inc. operates a global online platform that provides opportunities for individuals who wish to offer accommodations or experiences ("Hosts") to connect with those seeking to book accommodations or experiences ("Guests").  The Airbnb platform enables Hosts to list their offers, which Guests can browse and book.  Airbnb is an innovator, including having been named by the American Innovation Index as the most innovative lodging brand in 2023.

3.      Airbnb Payments, Inc. ("Airbnb Payments"), a wholly-owned subsidiary of Airbnb, Inc. (collectively with Airbnb, Inc., "Airbnb"), accepts card payments from millions of Guests as the Merchant of Record.

4.      Hotel Tonight, LLC ("Hotel Tonight"), a wholly-owned subsidiary of Airbnb, Inc., operates an online platform that allows users to book reservations in third-party owned and operated hotels.

5.      As detailed herein, both Airbnb and Hotel Tonight directly pay various fees, including Interchange Fees, on each and every card payment from Guests.

6.      Visa has fixed the Interchange Fees that its issuing banks charge to Airbnb, Hotel Tonight, and other merchants in connection with the use of its branded credit or debit cards at artificially high levels.  These Interchange Fees amount to a tax on merchants operating in the United States.

7.      Visa has exercised its power in the United States, and its ability to wield the collective power of its more than 10,000 bank members, as detailed below, by steadily raising the Interchange Fees that it forces Airbnb, Hotel Tonight, and other Merchants to pay.

8.      Businesses of all types are forced to pay these inflated fees fixed by Visa and charged by its more than 10,000 member banks.  The result of Visa's fixing of the Interchange Fees and related payment processing fees is high fixed costs for Airbnb and Hotel Tonight, which hurts not just Airbnb and Hotel Tonight but all merchants and consumers alike.

9.      Visa and its member-banks maintain their fixed fees through a series of anticompetitive agreements which Visa implements and enforces.  One rule in particular that keeps the Interchange Fees fixed above competitive levels are the rules known as Honor All Cards ("HAC") Rules, which Visa enforces on merchants like Airbnb.

10.      Based on the anticompetitive conduct challenged in this Complaint, Airbnb and Hotel Tonight seek damages and injunctive relief, as appropriate, under federal antitrust law.

## JURISDICTION AND VENUE

11.      This Complaint is filed under Section 16 of the Clayton Act, 15 U.S.C. § 26, to prevent and/or restrain violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, and for damages under Section 4 of the Clayton Act, 15 U.S.C. § 15.  The Court has jurisdiction over the federal antitrust law claims alleged herein under 28 U.S.C. §§ 1331 and 1337.

12.      This Court has personal jurisdiction over Defendants because, among other things, Defendants:  (a) transact business throughout the United States, including in this District; (b) have substantial contacts with the United States, including in this District; and/or (c) are engaged in an illegal anticompetitive scheme that is directed at and has the intended effect of causing injury to persons residing in, located in, or doing business throughout the United States, including in this District.

13.     Venue in this District is proper under 28 U.S.C. § 1391 and Section 12 of the Clayton Act, 15 U.S.C. § 22.  Defendants transact business and are found in this District.

14.     Member banks of Visa located in this District issue Defendants' credit and debit cards and/or acquire retail Merchant transactions for Visa credit, debit, and store-value cards. The interstate trade and commerce involved and affected by the alleged violations of the antitrust laws was and is carried on in part within this District.  The acts complained of have had substantial anticompetitive effects in this District.

## DEFINITIONS

15.     "Acquirer" or "Acquiring Bank" means a bank or other financial institution that has been authorized by a General Purpose Payment Card Network to enter into agreements with Merchants that enable those entities to accept General Purpose Payment Cards for the purchase of goods and services.

16.     "General Purpose Credit Card" means a plastic card or other physical form factor, such as a key fob, provided by an Issuer that allows cardholders to pay for goods and services at a large number of diverse Merchants by accessing a line of credit extended to the cardholder by the Issuer.

17.     "General Purpose Debit Card" means a plastic card or other physical form factor, such as a key fob, provided by an Issuer that allows cardholders to pay for goods and services at a large number of diverse Merchants by accessing an asset account, typically the cardholder's demand deposit account ("DDA"), at a bank or other financial institution.

18.     "General Purpose Payment Card" means a General Purpose Credit Card or a General Purpose Debit Card.

19.     "General Purpose Payment Card Network" means an electronic payment system used to accept, transmit, or process transactions made by General Purpose Payment Cards for

3

money, goods, or services, and to transfer information and funds among Issuers, Acquirers, Payment Service Providers, Merchants, and users of General Purpose Payment Cards.  Visa operates a General Purpose Payment Card Network.

20.    "Honor All Cards" means the rules of Visa that require any Merchant that accepts Visa-branded General Purpose Credit Cards to accept all such Visa-branded General Purpose Credit Cards, and the rules of Visa that require any Merchant that accepts Visa-branded General Purpose Debit Cards to accept all such Visa-branded General Purpose Debit Cards.

21.    "Interchange Fees" are fees fixed by Visa and its member banks that are paid to Issuers by Merchants in conjunction with transactions in which Visa General Purpose Payment Cards are used as a means of payment for purchases of goods and services.  Airbnb and Hotel Tonight pay these Interchange Fees directly to the Issuer.

22.    "Issuer" or "Issuing Bank" means a bank or other financial institution that issues General Purpose Payment Cards to consumers to pay for goods and services.  Issuers authorized by the Visa General Purpose Payment Card Networks to issue Visa-branded General Purpose Payment Cards are members of those networks.

23.    "Merchant of Record" or "Merchant" means the entity in the payment processing structure that is authorized and held liable for the processing and settlement of transactions and accordingly enters into contractual arrangements and negotiates terms, including pricing, with the Acquirers and the relevant card networks.  The Merchant of Record is contractually responsible for settling the costs incurred in the payment process.  Airbnb and Hotel Tonight serve as the Merchant of Record for all Guest bookings of Host listings.

24.    "Payment Service Provider" means an entity that connects the Merchant of Record and the corresponding Acquiring Bank through a real-time gateway in order to route the

4

card transaction information to and through the General Purpose Payment Card Network on behalf of the Merchant of Record.

25.     "PIN Debit Card" means a General Purpose Debit Card with which the cardholder authorizes a withdrawal from his or her bank account by presenting his or her card at the point-of-sale and entering a personal identification number ("PIN") as the verification method.

26.     "Premium Payment Card" means a General Purpose Credit Card that carries a higher Interchange Fee than standard General Purpose Credit Cards.  The "Visa Signature Preferred Card" or "Visa Infinite" products are examples of Premium Payment Cards.

27.     "Signature Debit Card" means a General Purpose Debit Card with which a cardholder authorizes a withdrawal from their bank account, usually by presenting the card at the point-of-sale and signing a receipt or point-of-sale terminal.

## PARTIES

### A.     Plaintiffs

28.     Airbnb, Inc. and Airbnb Payments are both Delaware corporations headquartered in San Francisco, California.  Airbnb Payments is a wholly-owned subsidiary of Airbnb, Inc. Airbnb Payments accepts Visa credit and debit cards from Guests for payment.  Airbnb earns the majority of its revenue by collecting service fees from Guests and Hosts.

29.     Airbnb Payments has accepted Visa credit and debit cards from millions of Guests for stays and experiences with Hosts, the majority of which are individuals who open up their personal property for Guest use.

30.     Hotel Tonight LLC, a subsidiary of Airbnb, Inc., is a Delaware limited liability company headquartered in San Francisco, California.  Hotel Tonight accepts Visa credit and debit cards from Guests for payment at its millions of hotel listings.  Hotel Tonight earns the majority of its revenue from the associated transactions.

**B.      Defendants**

31.      Prior to the Visa initial public offering ("IPO"), Visa International and Visa U.S.A. were each bank associations that were governed by a board of directors comprised of bank executives selected from their member banks.  Visa International also had regional boards of directors for each of its geographic regions.

32.      In 2007 and 2008, Visa U.S.A. and Visa International, in addition to other Visa entities not named as Defendants, conducted a number of corporate restructurings to combine several previously independent corporate entities into Defendant Visa Inc.  On March 19, 2008, Visa Inc. conducted an IPO through which it offered ownership shares to the general public and also issued ownership shares to its member banks.  As a result, Visa Inc. became and operates today as a publicly-traded Delaware corporation, with its principal place of business in Foster City, California.  Upon the restructuring, Visa U.S.A. and Visa International became wholly-owned subsidiaries of Visa Inc., and they continue to operate as such today.  Visa Inc., Visa U.S.A., and Visa International are collectively referred to herein as "Visa."

33.      Visa operates General Purpose Payment Card Networks.

**CO-CONSPIRATORS**

34.      Various persons and entities participated as co-conspirators in the violations alleged herein and have performed acts in furtherance of the conspiracies.  The co-conspirators include, but are not limited to, the following:  (a) Issuers that have issued Visa payment cards and have agreed to inflate, set, and enforce, through anticompetitive rules and restraints, Visa Interchange Fees; (b) Acquirers that acquire Visa transactions from Airbnb and Hotel Tonight and who agreed to and have imposed the anticompetitive rules and restraints on Airbnb and Hotel Tonight; and (c) banks that have or had membership on Visa's board of directors and, as

described above, specifically adopted and agreed to impose the challenged rules and restraints upon Airbnb, its Hosts, its Guests, Hotel Tonight, its Hotels, and its Guests.

**FACTUAL ALLEGATIONS**

**A.      Airbnb's Payment Platform**

      **1.      Airbnb's Acceptance of Payment Cards**

35.      When Airbnb, Inc. was founded in 2008, it was initially called AirBed & Breakfast, Inc., but it changed its name to Airbnb, Inc. in 2010.  Initially, Guests and Hosts connected through the Airbnb Platform, but they did not use it to settle payments.  Instead, Guests and Hosts settled up in-person, often through a cash transaction.  Airbnb introduced a major innovation when it began accepting payment cards along with a multitude of other platform enhancements to improve the Guest-Host experience.

36.      When a Guest is ready to book an accommodation or experience from a Host with a payment card, Airbnb Payments pays out the fixed Interchange Fees to the Payment Card Networks as follows:

37.      The Guest initiates the card transaction for its selected booking using the Airbnb Platform.  Airbnb Payments logs the payment event in its secure, encrypted databases.  The Guest's amount due is charged either entirely at booking or in two installments collected prior to check-in.  Regardless of which option is chosen, Airbnb's Payment Service Provider eventually routes the relevant transaction information to the General Purpose Payment Card Networks.

38.      Within the United States, Airbnb Payments is the Merchant of Record for transactions on the Airbnb Platform.  Airbnb Payments passes the transaction information to its various Acquirers through its various Payment Service Providers.

39.      Airbnb's Acquirer routes the transaction to the relevant card network affiliated with the consumer's card (*e.g.*, Visa).  Airbnb pays a variety of card network fees associated with

7

these networks, including assessments pegged to the transaction amount and flat fees.  The Visa card network then routes the transaction to the Issuer, which authorizes or declines the consumer's transaction.  The Issuer communicates through the card network to the Acquirer and Airbnb Payments to inform a Host that a listing has been booked.

40.     The Issuer then deducts an Interchange Fee fixed by Visa (as both a percentage of the amount of the transaction and a fixed fee per transaction) from the funds owed to Airbnb. The remaining funds are then disbursed to Airbnb's account with its Acquiring Bank through the card network.  The Interchange Fee is deducted before the funds are transmitted to Airbnb Payments, meaning that Airbnb is the party that directly pays the Interchange Fee to the Issuer. This Interchange Fee varies based on the consumer's card type, the merchant category code, the transaction type, and the transaction size.  Any applicable transaction-level card network assessment fees are also assessed to Airbnb.

41.     Airbnb Payments next remits a service fee to Airbnb Inc. for its booking and support services before sending the balance to the Host less any applicable taxes.  Airbnb Payments is the direct payor of the Interchange Fees at issue, and the direct purchaser of card acceptance services from Visa.  Either directly or through Payment Service Providers, Airbnb Payments is the entity that contracts with Visa and/or its current (or historical) Acquiring Bank network members in order to enable card transactions with Visa for its millions of Guests and Hosts.

### 2.     Hotel Tonight's Acceptance of Payment Cards

42.     Hotel Tonight was founded in 2010 as an online booking platform offering last-minute deals on unreserved hotel rooms.  While maintaining its signature last-minute discounts, Hotel Tonight has expanded its offerings to include advance bookings with a focus on boutique,

independent, or curated hotels.  Airbnb wholly acquired Hotel Tonight in 2019, but Hotel Tonight maintains separate payment infrastructure.  When a Guest books a stay with a listed hotel using a Visa-branded payment card, Hotel Tonight is responsible for paying the fixed Interchange Fee set by Visa that applies to the transaction.

**B.     Visa**

43.     Visa has used a series of agreements and practices to fix prices, to avoid competition, and protect its substantial market power.

44.     A key pillar of these agreements and practices are the Honor All Cards rules. Pursuant to these rules, Visa's member/owner banks (including every one of its Issuers and Acquirers) have agreed to require that any Merchant that accepts any one bank's General Purpose Credit (or Debit) Cards issued through Visa must accept all other banks' General Purpose Credit (or Debit) Cards that Visa carries.  In addition, those same banks have agreed to fix prices via Interchange Fee rules, whereby fixed Interchange Fees apply to every transaction for which the Issuer and Acquirer or Merchant have not individually negotiated fees (which rarely, if ever, occurs).

45.     Visa itself is the enterprise by which competing banks implement and effectuate its agreements not to compete and agreements to fix prices.

46.     Although Visa initially focused its conduct on General Purpose Credit Cards, once it achieved substantial market power in the General Purpose Credit Card transactions market, it leveraged it to achieve substantial market power in the General Purpose Debit Card transactions market.

47.     Visa set both Issuers' General Purpose Credit Card and Debit Card Interchange Fees at supracompetitive levels—fees directly paid to Issuers by, among others, Airbnb and Hotel Tonight.

### 1.     Visa facilitated horizontal agreements of its member banks

48.     Before its IPO, Visa was an association of competitor banks.  Pre-IPO, these banks exercised complete control over every aspect of Visa's business.  This control was used to implement the member banks' agreements (through the Honor All Cards rules) not to compete for Merchant acceptance of General Purpose Payment Cards, and the associated agreements (through the default Interchange Rules) to fix the prices of Interchange Fees for Visa General Purpose Payment Card transactions.

49.     The agreements broadened as more banks joined Visa and agreed to abide by agreements not to compete and to fix prices.  The agreements also broadened during that time period when the banks added new high-Interchange Fee products to the universe of Visa products that were subject to the same conspiracies.

50.     Like those restrictive provisions to which the member banks agreed in their capacities as board members and/or owners of Visa, the anticompetitive conduct by Visa establishing the agreements not to compete and price-fixing schemes were the products of horizontal agreements among competing Issuers.  These agreements amounted to collusion among horizontal competitors, and this collusion is still ongoing today.

### 2.     The Honor All Cards rules constitute horizontal agreements not to compete on price

51.     In order to eliminate any incentive for Issuers to compete for Merchant acceptance based on the price of interchange, as they would have done in a competitive market,

the member banks on Visa's governing boards of directors adopted, approved, implemented, and maintained the Honor All Cards rules.

52.     Visa's policies require that its Issuers and Acquirers agree to abide by its rules (including the Honor All Cards rules), and that the rules will be enforced upon Merchants.

53.     As a result of the Honor All Cards rules, Airbnb and Hotel Tonight are unable to generate competition among Issuers for its business.

54.     The Honor All Cards rules are not necessary for a General Purpose Payment Card Network to function.  Moreover, even if the Honor All Cards rules have some colorable rationale, their objectives could be realized through less restrictive means.

> **3.     The Interchange Fee rules are unlawful horizontal agreements on price**

55.     Visa fixes the prices of Interchange Fees.  Visa then requires that the fixed Interchange Fee apply to every transaction for which the Issuer and Acquirer has not entered into a separate, individually-negotiated agreement regarding fees (*i.e.*, bilateral agreement).

56.     All Issuers use the same Interchange Fee schedules for any given Visa payment transaction but, within each of those schedules, there is variability in the fees charged for various transactions.

> **4.     Visa has used its price-fixing schemes to establish, maintain, and enhance its long-held market power**

57.     Using price fixing to induce Issuers to join its association, Visa acquired substantial market power in the General Purpose Payment Card transactions markets, as courts have repeatedly held.  That Visa possesses substantial market power is supported by direct evidence, including the following:

(a)      *Ability to raise Interchange Fees*

58.      Visa's substantial market power has existed and increased for the last several decades.  By the 1990s, Visa General Purpose Credit Cards became the primary or only such cards for tens of millions of consumers in the United States.  Accepting Visa General Purpose Credit Cards became a competitive necessity for the vast majority of Merchants.

59.      In the General Purpose Credit Card transactions market, Visa raised General Purpose Credit Card Interchange Fees without Merchants ceasing to accept Visa's General Purpose Credit Cards.  Visa permitted Issuers to reclassify standard Visa General Purpose Credit Cards as Premium Payment Cards.  Issuers responded by converting large portions of their outstanding cards to Premium cards with higher Interchange Fees, and the overall Interchange Fees that Merchants paid for transactions increased dramatically.

60.      Visa continues to possess by far the highest market shares and the highest number of General Purpose Credit Cards in circulation.  Accordingly, most Merchants must accept Visa General Purpose Credit Cards to remain viable.

61.      In the mid-2000s, Visa raised its Signature Debit Card Interchange Fees, and then exercised its monopoly power to increase PIN Debit Card Interchange Fees as well. Notwithstanding these price increases, Visa's debit volumes have increased over time.  As with General Purpose Credit Cards, Merchants could not drop Visa's Signature Debit or PIN Debit products despite these significant price increases.

62.      Visa's ability to price discriminate also illustrates it market power.  Visa establishes separate Interchange Fees for each Merchant category, for each of its card products (credit, Signature Debit, PIN Debit, and commercial), and for an individual Merchant's acceptance volume.  Thus, two transactions conducted with the same Visa payment card could

have different Interchange Fee rates based upon the size or type of Merchant that accepted the card.

*(b)     Enforcement of anticompetitive rules and policies*

63.     Visa's successful enforcement of anticompetitive rules and policies that harmed Merchants without losing Merchant acceptance or transaction volume demonstrates the substantial market power that Visa has in the General Purpose Payment Card transactions markets.

64.     Under the Honor All Cards rules, Airbnb and Hotel Tonight must accept all debit or all credit cards bearing Visa's brand, regardless of the Issuer or level of fixed Interchange Fee that Airbnb and Hotel Tonight will pay.  Visa's anti-steering rules also prevent any erosion of Visa's market power.

65.     Despite the adverse economic impact of these rules and policies on Merchants, given Visa's substantial market power, Merchants could not afford to stop accepting Visa transactions.  Airbnb and Hotel Tonight cannot drop Visa General Purpose or Premium Credit or Debit Cards without depriving Airbnb Hosts and Hotel Tonight's hotels of an unacceptable number of sales.

**5.     The Visa IPO was a change in corporate form that maintained and enhanced the existing practices**

66.     The member banks that sat on the Visa boards and controlled them approved Visa's reorganizations into corporate entities that offered a portion of its shares to members of the public through IPOs.  The member banks structured post-IPO Visa in ways that were designed to perpetuate, and not to disturb, the anticompetitive conduct detailed in this Complaint.

67.     In response to a host of additional antitrust challenges, Visa and its member banks decided to change the organizational structures of Visa to attempt to evade antitrust liability

13

through superficial changes in corporate form.  The member banks agreed that post-IPO Visa would continue to support the agreements not to compete and to fix prices.

68.     Post-IPO, Visa acts as the pricing and rules enforcement agents for its member banks.  Through the corporate reorganizations and subsequent IPOs, each member bank effectively delegated to Visa, in perpetuity, the ability to fix the bank's pricing to Merchants. Each member bank knew that all other Visa member banks were also delegating its pricing decisions to Visa when they voted to approve Visa's restructurings.

69.     Moreover, as part of the corporate reorganizations leading to its IPO, the member banks reaffirmed and effectively readopted Visa's rules, including the default Interchange Fee and Honor All Cards rules.

**C.     Defendants' Interchange Fee Practices Are Restraints of Trade Without Justification**

70.     General Purpose Payment Card systems have functioned successfully without Interchange Fees in the United States and internationally.  Moreover, the Interchange Fees set by Defendants are not based on cost.  Interchange Fees offer no procompetitive justification to offset the anticompetitive harm caused by the conduct detailed in this Complaint.

71.     International experience regarding Interchange Fees on General Purpose Credit Card transactions shows that Interchange Fees in the United States have been fixed at supracompetitive levels.

## **ANTITRUST INJURY**

72.     Airbnb and Hotel Tonight has suffered direct antitrust injury from Defendants' conduct.  Airbnb and Hotel Tonight have directly paid substantial, unlawful overcharges as a direct result of the price fixing and monopolization set out in this Complaint.  Airbnb and Hotel

Tonight also have been deprived of the benefits of competition limited by this conduct in the relevant markets.

73.     The effect of these artificially inflated fees—assessed to and paid by Airbnb and Hotel Tonight—is higher retail prices paid by consumers economy-wide, including Airbnb and Hotel Tonight's Guests.  As booking prices increase in response to inflated fees, consumers can afford less and thus purchase less, reducing output.

## RELEVANT MARKETS

74.     Visa operates payment platforms.  These are "two sided" platforms in that Merchants want to accept the payment cards that cardholders carry and use, and cardholders want to carry and use payment cards that are widely accepted.

75.     Payment platforms effectuate transactions to Merchants from their customers through the use of credit or debit transactions.  The Visa payment-card network thus sells transactions to both "sides" of the market—Merchants, on the one hand, and consumers on the other.  As stated by the Supreme Court, "credit-card companies are best understood as supplying only one product—transactions—which is jointly consumed by a cardholder and a [M]erchant."

76.     There are two "transactions" product markets in which Defendants participate: (i) the market for General Purpose Credit Card transactions in the United States (*i.e.*, the credit card market); and (ii) the market for General Purpose Debit Card transactions in the United States (*i.e.*, the debit card market).

77.     In the case of transaction networks, where the relevant good is the payment card transaction itself (such as the markets for General Purpose Payment Card transactions), economic literature indicates that competitive effects on both sides of the market should be taken into consideration.

78.     The markets for General Purpose Credit Card transactions and General Purpose Debit Card transactions are distinct.  Consumer demand establishes separate General Purpose Credit Card and General Purpose Debit Card markets.  There are, accordingly, corresponding markets for General Purpose Credit Card *transactions* and General Purpose Debit Card *transactions*.  These markets capture both sides of the two-sided "transaction platform" of the networks' payment platforms.  Visa has exercised market power within these markets.

### A.     The Markets for General Purpose Credit Card Transactions and General Purpose Debit Card Transactions Are Distinct

#### 1.     General Purpose Credit Card transactions

79.     There are relevant product markets for General Purpose Credit Cards and General Purpose Credit Card transactions.  Certain characteristics of credit cards make them unique.  General Purpose Credit Cards allow a consumer to purchase goods and services by accessing a line of credit extended to the cardholder by the Issuer that issued the card.  These cards provide consumers deferred payment and, typically, the opportunity to revolve balances over time.

80.     From the consumer perspective, there are no close substitutes for General Purpose Credit Cards because other forms of payment do not offer comparable credit facilities.  Therefore, General Purpose Credit Cards are better suited for large purchases that a consumer needs to finance over time than are payment methods such as cash, checks, and General Purpose Debit Cards that do not allow deferred payment.  This feature is reflected in studies of consumer payment patterns, which show that the average transaction size for General Purpose Credit Card transactions consistently has significantly exceeded the average ticket for General Purpose Debit Card transactions since the mid-1990s.

81.     General Purpose Credit Cards have a unique bundle of characteristics that consumers find useful for certain types of transactions, and for which other payment methods are

not close substitutes.  A market-wide increase in cardholder fees would not cause sufficient decline in usage for the price increase to be unprofitable to Issuers; demand is sufficiently inelastic to establish a market for General Purpose Credit Cards.  This has been the case through the present.

82.     The absence of sensitivity of General Purpose Credit Card Interchange Fees to Interchange Fees for General Purpose Debit Cards is strong economic evidence that General Purpose Credit Cards and Debit Cards are not in the same relevant market.

83.     Visa has continued to raise General Purpose Credit Card Interchange Fees, including significant rate increases for Premium Payment Card transactions, and no major Merchants have stopped accepting Visa General Purpose Credit Card transactions.  Merchants such as Airbnb and Hotel Tonight continue to believe that a sufficient number of consumers view General Purpose Credit Cards as unique and that Merchants must accept them.  General Purpose Credit Card transactions is a well-defined market characterized by an inelasticity of demand and universal recognition by the public, the parties, and the industry as a whole.

**2.     General Purpose Debit Card transactions**

84.     There are relevant product markets for General Purpose Debit Cards and General Purpose Debit Card transactions.  These markets consisted of both Signature Debit Cards and PIN Debit Cards.  The existence of these markets has been confirmed by economic analysis of cross-inelasticity of demand and by industry and public recognition.  These markets continue to be relevant product markets to this day.

85.     General Purpose Debit Cards permit consumers to purchase goods and services by directly accessing the consumer's asset account.  General Purpose Debit Cards include stored-value cards, such as payroll cards and flexible spending account cards, where funds are pre-

loaded into an account associated with the card and the cardholder can only spend up to the amount pre-loaded on the card.

86.    Both PIN Debit Cards and Signature Debit Cards offer basically the same functionality to consumers — a means of payment that is widely accepted and provides for a quick and automatic transfer of funds from the cardholder's asset account to the Merchant's account.  While the signature and PIN methods of authentication differentiate the products, consumers tend to view them as close substitutes.  Merchants' ability to steer cardholders from Signature Debit Cards to PIN Debit Cards confirms this fact.

87.    General Purpose Debit Cards possess a combination of characteristics that make them particularly well-suited for certain types of transactions.  Because payments are deducted in a matter of hours (or a few days at most) from a consumer's account, General Purpose Debit Cards are differentiated from General Purpose Credit Cards.  Consumers do not consider General Purpose Credit Cards to be an adequate substitute for General Purpose Debit Cards.

88.    Consumers view General Purpose Debit Cards as superior to cash, checks, and other electronic payment methods and, thus, they likely would not switch in response to a small but significant, non-transitory price increase.  In any event, Airbnb does not accept cash or checks at all for Guest transactions, and these forms of payment are not reasonably interchangeable with General Purpose Debit Card transactions for Merchants, particularly online Merchants such as Airbnb and Hotel Tonight.  As the price of PIN Debit Card acceptance increased to the supracompetitive levels of today, Merchants did not substitute away from debit.

**B.    The Geographic Market Is the United States**

89.    The geographic market for all relevant product markets is the United States and its territories.  Many of Visa's rules regarding General Purpose Credit Card and General Purpose

Debit Card transactions apply only to the U.S. market.  Visa also sets policies and pricing —

including Interchange Fees — separately for the United States from other regions.  Additionally,

U.S. consumers would not find General Purpose Credit Cards or General Purpose Debit Cards

issued in other countries to be adequate substitutes for General Purpose Credit Cards or General

Purpose Debit Cards issued by U.S. banks.

**C.      Defendants' Conduct Has Had Adverse Competitive Effects In Any Relevant
         Market**

90.      Visa exercises substantial market power in the market for General Purpose Credit

Card transactions and has significant market share.  Combined with the significant entry barriers

facing potential new, competing payment networks, this cardholder penetration gives Visa power

to control prices or exclude competition across its credit card payment platforms.  Visa's ability

to raise Interchange Fees without losing transaction volume in General Purpose Credit Cards is

direct evidence of its market power.

91.      Visa also exercises monopoly power in the market for General Purpose Debit

Cards and services, including under a platform-wide market definition encompassing both

Merchants and consumers – here, Airbnb and Hotel Tonight, and their Guests.  Visa has

demonstrated its ability to control prices or output by profitably raising Interchange Fees net of

any cardholder rewards for its debit products.  This ability to raise Interchange Fees net of any

cardholder rewards without losing Merchant acceptance or transaction volume is directly

probative of its monopoly power across the General Purpose Debit Card payment platform.

Notably, Visa again raised its Interchange Fee schedules for multiple Merchant categories and

card offerings in October 2023, including those categories and card offerings that

disproportionately affect Airbnb and Hotel Tonight.

92.     Defendants' price fixing and Visa's monopolization have reduced total output by raising net prices to Visa customers and by resulting in products of decreased quality.  Visa's market power has allowed it to impose supracompetitive Interchange Fees on Merchants.  These inflated fees have forced Merchants to raise prices above what they would charge if competition existed in the payment services industry.  The net result is fewer sales for Merchants and higher costs to consumers.

93.     This reduced cardholder purchasing power, in turn, reduces total output — *i.e.,* the quantity of credit and debit card purchases (and total purchases) — below the competitive level.

94.     Visa cardholders would enjoy equal or greater cardholder rewards absent Defendants' price fixing and Visa's monopolization.  High Interchange Fees are not necessary to fund competitive cardholder reward programs.  Given the miniscule cost of transaction processing today, Issuers pocket most of the interchange revenue as increased profits rather than distributing it in the form of rewards.

## CLAIMS FOR RELIEF

### Count 1:  Horizontal Price Fixing and Horizontal Agreements Not to Compete in the Market for General Purpose Credit Card Transactions (Sherman Act Section 1)

95.     Airbnb and Hotel Tonight incorporate by reference each and every allegation contained in the foregoing paragraphs.

96.     Visa and its member banks' agreement not to compete and to fix prices constitute anticompetitive horizontal restraints.

97.     Visa and its member banks have maintained the conspiracy for Visa General Purpose Credit Card transactions.

98.     This conspiracy anticompetitively increased, and maintained, the Interchange Fees that Airbnb paid to Issuers for Visa General Purpose Credit Card transactions, and it imposed additional damages in the form of network fees, fines, and fraud losses.  These price increases were the products of the agreement among Visa and its owner/member banks that the banks will not compete for Merchants' acceptance of Visa transactions.

99.     The price-fixing conspiracy and agreement not to compete are *per se* unlawful under Section 1 of the Sherman Act.  But even if analyzed under a quick look or rule of reason, this conspiracy and agreement not to compete are unreasonable restraints of trade in violation of Section 1.  This scheme served no legitimate business purpose, and achieved no legitimate efficiency benefit to offset its substantial anticompetitive effects.

100.    Airbnb and Hotel Tonight suffered antitrust injury from these *per se* unlawful and/or unreasonable restraints of trade.

101.    As a direct and proximate result of these violations of Section 1 of the Sherman Act, Airbnb and Hotel Tonight have been injured in their business and property in an amount to be determined at trial.

**Count 2:  Horizontal Price Fixing and Horizontal Agreements Not to Compete in the Market for General Purpose Debit Card Transactions (Sherman Act Section 1)**

102.    Airbnb and Hotel Tonight incorporate by reference each and every allegation contained in the foregoing paragraphs.

103.    Visa and its member banks' agreement not to compete and to fix prices constitute anticompetitive horizontal restraints.

104.    Visa and its member banks have maintained the conspiracy for Visa General Purpose Debit Card transactions through the present.

105.    This conspiracy anticompetitively increased, and maintained, the Interchange Fees that Airbnb paid to Issuers for Visa General Purpose Debit Card transactions, and it imposed additional damages in the form of network fees, fines, and fraud losses.  These price increases were the products of the agreement among Visa and its owner/member banks that the banks will not compete for Merchants' acceptance of Visa transactions.

106.    The price-fixing conspiracy and agreement not to compete are *per se* unlawful under Section 1 of the Sherman Act.  Even if analyzed under a quick look or rule of reason, this conspiracy and agreement not to compete are unreasonable restraints of trade in violation of Section 1.  This scheme served no legitimate business purpose, and achieved no legitimate efficiency benefit to offset its substantial anticompetitive effects.

107.    Airbnb and Hotel Tonight suffered antitrust injury from these *per se* unlawful and/or unreasonable restraints of trade.

108.    As a direct and proximate result of these violations of Section 1 of the Sherman Act, Airbnb and Hotel Tonight have been injured in their business and property in an amount to be determined at trial.

### **Count 3:  Vertical Price Restraints in the Market for General Purpose Credit Card Transactions (Sherman Act Section 1)**

109.    Airbnb and Hotel Tonight incorporate by reference each and every allegation contained in the foregoing paragraphs.

110.    Visa and its member banks' price-fixing schemes constituted unreasonable and anticompetitive vertical restraints.

111.    Visa entered into an express vertical agreement with each of the member banks binding all of them to comply with the rules and regulations adopted by Visa, including the default Interchange Fee and Honor All Cards rules.  In turn, Visa acted as the enforcement agent

for its rules and regulations and held Issuing and Acquiring members responsible for compliance with these rules and regulations.  These agreements have continued in full effect throughout the present.

112.    These vertical price restraints imposed supracompetitive Interchange Fees on Airbnb for Visa General Purpose Credit Card transactions, and it imposed additional damages in the form of network fees, fines, and fraud losses.  These restraints have continued in full effect through the present and constituted unreasonable restraints of trade in violation of Section 1 of the Sherman Act.  This scheme served no legitimate business purpose, and achieved no legitimate efficiency benefit to offset its substantial anticompetitive effects.

113.    Airbnb and Hotel Tonight suffered antitrust injury from these unreasonable restraints of trade.

114.    As a direct and proximate result of this violation of Section 1 of the Sherman Act, Airbnb and Hotel Tonight have been injured in their business and property in an amount to be determined at trial.

**Count 4**:  **Vertical Price Restraints in the Market for General Purpose Debit Card Transactions (Sherman Act Section 1)**

115.    Airbnb and Hotel Tonight incorporate by reference each and every allegation contained in the foregoing paragraphs.

116.    Visa and its member banks' price-fixing schemes constituted unreasonable and anticompetitive vertical restraints.

117.    Visa entered into an express vertical agreement with each of the member banks binding all of them to comply with the rules and regulations adopted by Visa, including the default Interchange Fee and Honor All Cards rules.  In turn, Visa acted as the enforcement agent for its rules and regulations and held Issuing and Acquiring members responsible for compliance

with these rules and regulations.  These agreements have continued in full effect through the present.

118.    These vertical price restraints imposed supracompetitive Interchange Fees on Airbnb and other Merchants for Visa General Purpose Debit Card transactions, and it imposed additional damages in the form of network fees, fines, and fraud losses.  These restraints have continued in full effect through the present and constituted unreasonable restraints of trade in violation of Section 1 of the Sherman Act.  This scheme served no legitimate business purpose, and achieved no legitimate efficiency benefit to offset its substantial anticompetitive effects.

119.    Airbnb and Hotel Tonight suffered antitrust injury from these unreasonable restraints of trade.

120.    As a direct and proximate result of this violation of Section 1 of the Sherman Act, Airbnb and Hotel Tonight have been injured in their business and property in an amount to be determined at trial.

**Count 5:  Monopolization and Attempted Monopolization of the Market for General Purpose Debtit Card Network Services (Section 2 of Sherman Act)**

121.    Airbnb and Hotel Tonight incorporate by reference each and every allegation contained in the foregoing paragraphs.

122.    Through the anticompetitive acts set forth above, Visa has unlawfully acquired or attempted to acquire monopoly power in the market for General Purpose Debit Card Network Services. Visa has taken acts that have the effect of giving it power over price and the power to exclude competition in the market for General Purpose Debit Card Network Services.

123.    Visa has further unlawfully maintained its monopoly power through anticompetitive conduct that had the purpose and effect of excluding competition from, and raising the costs of, other providers of General Purpose Debit Card Network Services.

124.    As a direct and proximate result of Visa's exclusionary conduct, Interchange Fees and network fees for General Purpose Debit Card Network Services were set at artificial, supracompetitive levels, and Airbnb and Hotel Tonight suffered injury to their businesses and property by paying such artificially-inflated, supracompetitive Interchange Fees and network fees, in an amount to be determined at trial. Airbnb and Hotel Tonight suffered antitrust injury from these acts of monopolization.

125.    Visa's unlawful acquisition of monopoly power constituted a violation of Section 2 of the Sherman Act. Visa's unlawful maintenance of monopoly constitutes a violation of Section 2 of the Sherman Act, which is ongoing.

### PRAYER FOR RELIEF

WHEREFORE, Airbnb and Hotel Tonight pray for a judgment in their favor and against Defendants and for the following relief:

A.    That the Court declare, adjudge and decree that Defendants have committed the violations of the laws alleged herein;

B.    That the Court award damages sustained by Airbnb and Hotel Tonight because of Defendants' misconduct, in an amount to be proved at trial, to be trebled in accordance with antitrust law, plus interest, including prejudgment interest, attorneys' fees and costs of suit;

C.    That the Court award restitutionary damages to Airbnb and Hotel Tonight; and

D.    That the Court order such other and further relief as the Court may deem just and proper.

### JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Airbnb and Hotel Tonight hereby demand a trial by jury of all issues properly triable thereby.

Dated: July 29, 2023

By:     /s/ *Marc L. Greenwald*

      Marc L. Greenwald
      Steig D. Olson
      **QUINN EMANUEL URQUHART &**
        **SULLIVAN, LLP**

      51 Madison Avenue, 22nd Floor
      New York, New York 10010
      Telephone:  (212) 849-7000
      Facsimile:  (212) 849-7100
      marcgreenwald@quinnemanuel.com
      steigolson@quinnemanuel.com

      *Attorneys for Plaintiffs Airbnb, Inc., Airbnb*
      *Payments, Inc., & Hotel Tonight LLC*